**In the Matter of Oliver D. RINKER, Beverly B. Rinker, Engaged in Farming, Debtors.**

**Bankruptcy No. 87–85–C.**

United States Bankruptcy Court, S.D. Iowa.

May 22, 1987.

R. Fred Dumbaugh, Cedar Rapids, Iowa, for debtors.

Elizabeth A. Nelson, Des Moines, Iowa, Trustee.

Linda R. Reade, Asst. U.S. Atty., Des Moines, Iowa, for U.S.

ORDER ON MOTION TO DISMISS

LEE M. JACKWIG, Bankruptcy Judge.

This case presents the interesting question of whether a debt that arises out of a settlement of a will dispute is also a debt that arises out of a farming operation for purposes of 11 U.S.C. section 101(17)(A). On April 2, 1987, this court conducted a hearing on motions to dismiss brought by the trustee, Jacqueline Souder, the Federal Land Bank of Omaha and the Production Credit Association of the Midlands (movants). Now that the April 17, 1987 briefing deadline has passed, the court considers the matter fully submitted. In summary, the movants argue that only 61% of the debtors' debt arises out of a farming operation since $431,300.00 of the total $1,104,670.00 debt results from the settlement. Thus, the debtors would not meet the 80% requirement of section 101(17)(A). For the reasons set out below, the court finds that the debtors have satisfied the 80% rule of section 101(17)(A).

## FACTUAL BACKGROUND

This case concerns the latest skirmish in the intrafamilial warfare among the beneficiaries of the joint will of J. Perry Rinker (Perry) and Daisy Rinker (Daisy). The combatants are the four children of Perry and Daisy: Oliver, who is one of the debtors, Jacqueline Rinker Souder, who is one of the movants, Janice L. Coy and Jeanette C. Smithson.

On February 19, 1959, Perry and Daisy executed a joint will. A codicil added June 29, 1960 provided that upon the death of the survivor of Perry and Daisy, all real property would be given to the four children. The will also provided that if Oliver were farming all or a portion of the real estate, he would be given the option to purchase the property at fair market value.

Perry died on November 3, 1974. On January 5, 1975, Daisy and Oliver executed a contract whereby Daisy sold to Oliver approximately 400 acres. Daisy died on October 3, 1977. Sometime thereafter, Jacqueline Souder brought suit against Oliver and Beverly Rinker in the Iowa District Court for Boone County. She alleged the terms of the contract were grossly unfair and that Daisy's signature on the contract was obtained through the undue influence Oliver had on Daisy by virtue of their confidential relationship. A trial was held on June 10, 1980, and on March 5, 1981 Judge Paul Hellwege found that a confidential relationship indeed existed and that, had it not been for the relationship, the contract would not have been executed. Consequently the contract was nullified, title to the real estate was quieted in the Rinker siblings and the will and codicil were given effect. Oliver and Beverly appealed the decision to the Iowa Supreme Court. Before the appeal was heard, the parties settled. It is this settlement that forms the basis of the motions to dismiss.

The settlement provided that each of the siblings would receive an undivided one-fourth interest in the January 2, 1975 contract. Additionally, Jacqueline Souder agreed to sell Oliver and Beverly her interest for $210,000.00 with $73,500.00 required to be paid down and the balance amortized over 10 years at 12% interest. Jacqueline gave Oliver a quit claim deed to her interest in the contract and property. To secure the balance owing on the purchase price, Oliver gave Jacqueline a mortgage to the property. The settlement agreement was executed on July 15, 1981.

On that same date, Oliver and Beverly and Janice Coy and Jeanette Smithson entered into a settlement agreement similar in most respects to the Souder agreement. Janice and Jeanette sold their undivided one-fourth interests to Oliver for $192,500.00 each. Oliver paid $67,375.00 to each as a down payment with the balance amortized over 12 years at 12% interest. Quit claim deeds were executed to Oliver who in turn gave mortgages to secure the outstanding indebtedness to Janice and Jeanette.

The Rinkers filed for protection under Chapter 12 on January 13, 1987. Their schedules indicate that $145,300.00 remains unpaid on the Souder indebtedness and $286,000.00 remains unpaid on the Smithson and Coy indebtedness. Together, the

sisters are owed $431,300.00. This amount constitutes approximately 39% of the $1,104,670.00 listed as the total amount owed to all creditors.

At the hearing on the motion to dismiss, the Rinkers adduced uncontroverted evidence that Oliver has been farming the property in question since 1957. Of the Rinkers' 560 acre farm, the 400 acres in question obviously make up a large part of the Rinkers' crop production enterprise. The residence, farm buildings, and storage facilities are located on the property.

## DISCUSSION

Only family farmers with regular annual income are eligible for protection under Chapter 12. 11 U.S.C. section 109(f). Family farmers are defined in part as those who:

(1) have aggregate debts that do not exceed $1,500,000.00;

(2) have at the date of filing at least 80% of their aggregate noncontingent, liquidated debts arising out of a farming operation owned or operated by them (excluding a debt for principal residence unless the debt arises out of a farming operation); and

(3) received, during the taxable year preceding the one in which bankruptcy was filed, 50% of their gross income from farming. 11 U.S.C. section 101(17)(A). Only a challenge to the second criterion is before the court.

11 U.S.C. section 101(20) defines "farming operation" as including:

[F]arming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock in an unmanufactured state.[1]

■ In dictum, the Seventh Circuit has turned to section 101(20) to interpret the "arise out of farming" language found in the 80% rule of section 101(17)(A). *Armstrong v. Corn Belt Bank*, 812 F.2d 1024 (7th Cir.1987). The primary issue in *Armstrong* was whether the debtor was a farmer under section 101(19) and thus immune from involuntary bankruptcy under section 303(a).[2] The *Armstrong* court's analysis of section 101(20) was integral in resolving the section 303(a) issue and the Chapter 12 eligibility question. In finding that the income generated from the sale of machinery in the debtors' effort to downscale his operation was income from a "farming operation", the court stated:

The machinery was purchased to work the acreage that represented [the debtor's] farming operation. Had the farm prospered, the machinery would have stayed in [the debtor's] possession. He bought the machinery so the farm could exist and prosper. But for the machinery, there would be no farm.... [Section 101(20)] does not provide a simple all-inclusive list of tasks and activities (i.e., tillage of the soil, dairy farming). Instead, the section starts out in general terms—'Farming operation includes farming, tillage of the soil, dairy farming.... Implicit in this definition is the inclusion of general activities inherent in farming and, we believe, the means (or in this case the equipment) necessary to perpetuate the farming operation the definition speaks of. When a farmer

---

1. Prior to passage of Chapter 12, the definition of "farming operation" was contained in section 101(18). Upon passage, section 101, paragraphs (17) through (49) have been redesignated as paragraphs (19) through (51) respectively. Bankruptcy Judges, United States Trustees and Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554, section 251, 1986, U.S. CODE CONG. & ADMN. NEWS. Former section 101(18) is now codified at section 101(20). *Id.* All references to section 101 in this order reflect these changes.

2. 11 U.S.C. section 101(19) defines a farmer as a "person that received more than 80 percent of such person's gross income during the taxable year of such person immediately preceding the taxable year of such person during which the case under such title concerning such person was commenced from a farming operation owned or operated by such person." This provision construed in tandem with section 101(20) has proven critical in section 303(a) cases. (Section 303 prohibits the commencement of involuntary Chapter 7 or 11 cases against farmers). See e.g., *Armstrong v. Corn Belt Bank*, 812 F.2d 1024 (7th Cir.1987); *In re Dakota Lay'd Eggs*, 57 B.R. 648 (Bankr.D.N.D.1986); and *In re Blanton Smith Corp.*, 7 B.R. 410 (Bankr.M.D. Tenn.1980).

sells some of his machinery in an effort to scale down his operation (say from 200–100 acres) and save the farm, the money received is inescapably from the 50% of the farming operation dissolved. *Armstrong* at 1026.

Clearly, the thrust of the court's analysis was the examination of the nature of the questioned activity and its relation to farming. So too this court must examine the nature of the questioned activity, here the settlements, and their relation to the Rinkers' farming operation. The movants would have this court look only to the fact that the debts in question resulted from a settlement of a lawsuit. However, *Armstrong* requires a more searching inquiry.

■ At the heart of the lawsuit and resultant settlement was the land. The land apparently was the major asset of the Perry and Daisy Rinker estate. It was the land over which the litigants fought and it was the land that was the subject of the settlement. Land is also the *sine qua non* of a crop production enterprise. Tillage of the land fits precisely into the definition of "farming operation" under section 101(20). It is undisputed that the Rinkers' purpose in settling the case was to preserve their farming operation. Without the land, the Rinkers would have no farm. It is this direct link between the basis of the lawsuit and settlement and the farming activity that leads this court to conclude that the debts in question arise out of a "farming operation". The mere fact that a debt arises from a settlement of a lawsuit does not mean the requirements of section 101(20) cannot be met.

Presented with a different set of facts this court might have ruled otherwise. Had the Rinkers' debt arisen from a wrongful death suit stemming from a hunting accident, there would be no doubt the debt was unrelated to a farming operation. Had the Rinkers given a plaintiff a mortgage on their farm to secure settlement payments resulting from a car accident, the resultant debt would not fall within the ambit of section 101(20). The subject of the settlement—the car accident—would not be related to a farming operation. The instant case is different. The relationship between the subject of the settlement and the "farming operation" within the meaning of section 101(20) is clear and direct.

The conclusion that the requirements of section 101(17)(A) are met in this case is buttressed by the fact that had the January 5, 1975 contract never been executed, Mr. Rinker would have been given the option to purchase the property at fair market value under the June 29, 1960 codicil. Had the option been exercised, debts for the purchase price would have been incurred by Mr. Rinker. Certainly the debts in that situation would have arisen out of a farming operation as the land would have been the basis of the sale and the will proviso calling for the option. Again, whether it be in the context of a sale, a lawsuit, a settlement of a lawsuit, or the effectuation of a will, the focus of the inquiry is on the subject matter of the proceeding in question. To the extent a debt arises out of such a proceeding and the subject matter of the proceeding falls within the definition of farming operation under section 101(20), the section 101(17)(A) criterion will have been satisfied.

### CONCLUSION AND ORDER

WHEREFORE, the court finds that the debts owed to Jacqueline Souder, Janice Coy and Jeanette Smithson arise out of a farming operation for purposes of 11 U.S.C. sections 101(17)(A) and 101(20).

THEREFORE, the motions to dismiss are denied.